**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Kathleen A. Herkenhoff (SBN 168562)
1999 Harrison Street, Suite 1560
Oakland, CA  94612
Telephone: (415) 772-4700
Facsimile:  (415) 772-4707
Email: *lking@kaplanfox.com*
        *kherkenhoff@kaplanfox.com*

**KUZYK LAW, LLP**
Michael D. Braun (SBN 167416)
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA  90067
Telephone:  (213) 401-4100
Facsimile:  (213) 401-0311
Email: *mdb@kuzykclassactions.com*

*Counsel for Plaintiff and the Proposed Class*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| RONALD RAYNALDO, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN HONDA MOTOR CO., INC.,<br><br>Defendant. | Case No. 3:21-cv-05808<br><br>**CLASS ACTION COMPLAINT**<br><br>**Demand for Jury Trial** |

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................... 1

JURISDICTION AND VENUE .......................................................................... 3

INTRADISTRICT CASE ASSIGNMENT .......................................................... 3

PARTIES ........................................................................................................... 3

    A.    Plaintiff.................................................................................................. 3

    B.    Defendant ............................................................................................. 5

SUBSTANTIVE ALLEGATIONS....................................................................... 7

    A.    Honda Controls The U.S. Auto Market Based On Years Of Emphasizing The Quality And Reliability Of Its Vehicles............................................ 7

    B.    Parasitic Draining in Vehicles Creates An Unreasonable Risk Of Failure Of Mandated Safety Features And Engine Stalls..................................... 11

    C.    Over Two Million Class Vehicles Suffering From The Parasitic Draw Defect Were Sold by Honda ...................................................................... 14

    D.    Plaintiff's Class Vehicle Suffers From The Parasitic Draw Defect...................... 15

    E.    Honda Knew That The Class Vehicles Suffered From The Defect Prior To Its Sale Of The Class Vehicles............................................................. 15

    F.    Honda's Service Bulletins Fail to Fix the Defect.................................. 22

    G.    Honda Breached The Express Warranties Covering The Class Vehicles............. 27

FRAUDULENT OMISSION/CONCEALMENT ALLEGATIONS........................... 28

TOLLING OF STATUTES OF LIMITATIONS ........................................................ 30

    A.    Discovery Rule..................................................................................... 30

    B.    Fraudulent Concealment ..................................................................... 31

CLASS ALLEGATIONS ....................................................................................... 31

CAUSES OF ACTION .......................................................................................... 34

    FIRST CAUSE OF ACTION VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, *et seq.*) (Brought on behalf of the Nationwide Class) ......................................... 34

    SECOND CAUSE OF ACTION VIOLATION OF THE CALIFORNIA UNFAIR BUSINESS PRACTICES ACT (Cal. Bus. & Prof. Code § 17200, *et seq.*) (Brought on behalf of the Nationwide Class) ......................................... 36

    THIRD CAUSE OF ACTION BREACH OF EXPRESS WARRANTY (Cal. Comm. Code §§ 2313, 10210) (Brought on behalf of the Nationwide Class)...... 39

**TABLE OF CONTENTS (cont.)**

FOURTH CAUSE OF ACTION BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (Cal. Comm. Code §§ 2314, 10212) (Brought on
behalf of the Nationwide Class).............................................................. 41

FIFTH CAUSE OF ACTION UNJUST ENRICHMENT (Brought on behalf of the
Nationwide Class, or Alternatively, the California Class).................................... 44

REQUEST FOR RELIEF ........................................................................... 44

DEMAND FOR JURY TRIAL....................................................................... 45

Plaintiff Ronald Raynaldo ("Plaintiff"), individually and on behalf of all those similarly situated, files this proposed class action suit against Defendant American Honda Motor Company, Inc. ("Honda"), based upon his personal knowledge as to facts specific to him and based upon the investigation of counsel in all other respects, and alleges as follows:

## **INTRODUCTION**

1.      Honda markets its vehicles in a manner to convince consumers that they are buying a product of the highest quality and made with the utmost care and, most importantly, that will be dependable. Honda has actively concealed, however that millions of Class Vehicles suffer from a defect which results in the failure of the vehicles' essential purpose: to safely transport consumers. As defined herein, the Class Vehicles are Honda CR-V (model years 2017-2019) and Honda Accord (model years 2016-2019).

2.      Currently sold automobiles need a functioning 12-volt battery.  A car battery is an essential component that provides power to a vehicle's sparkplugs and starter.  Batteries, when properly functioning, provide continuous power to keep items such as hazard lights and other safety mandated electronics operating when the engine is off. [1]

3.      A condition known as parasitic draining is a defect that each of the Class Vehicles alleged herein suffer.  Parasitic draining occurs when electrical components in a vehicle fail to shut down once the vehicle is parked and turned off, which in turn allows the components to continue consuming power from the battery (referred to herein as the "Defect"). If not properly repaired, parasitic draining results in the premature obsolescence of the vehicle's battery and various related component failures.

4.      In vehicles with a parasitic draw Defect, the vehicle will be unable to start, causing scores of issues, ultimately stranding consumers.    Further, the damage caused by the parasitic draw Defect manifests without advance notice, creating the risk of vehicles stopping while being driven, and threatening to cause and/or causing federally mandated safety features such as emergency hazard lights and headlights to fail. Prolonged and recurrent battery depletion results in

---

[1] *See* 49 C.F.R. § 571.108.

the overuse of the vehicle's alternator (which is used to replenish the battery when the engine is on) and can cause the vehicle's engine to stall.

5.     As a result of the Defect, Class Vehicle owners are often being required to pay hundreds or thousands of dollars in replacement batteries and repairs. Worse yet, many are still left with the Defect even after these expensive attempts at repair. Replacing batteries and other components which degrade as a result of the Defect are only temporary fixes, because the replacement components will ultimately fail as well.

6.     Honda knew, and/or was on notice of the fact, that its Class Vehicles suffered from the parasitic draw Defect even before commencing sales.  Indeed, Honda issued internal Service Bulletins to its authorized dealerships about the Defect found in the Class Vehicles, but has yet to offer a reliable solution to the Defect or recall the Class Vehicles. Instead, Honda has largely only instructed its dealers to update internal software and replace dead batteries in certain Class Vehicles, if necessary. Neither "corrective action" remedies the parasitic draw Defect nor does it make the vehicles any more dependable for their owners.

7.     If Plaintiff and/or other Class Members knew of the Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles or would have paid substantially less for them.  Plaintiff and other Class Members were denied the benefit of the bargain in connection with their purchases and/or leasing of the Class Vehicles.

8.     The conduct described herein makes Defendant liable for breach of warranties, and unfair, deceptive, and/or fraudulent business practices.  In turn, owners and/or lessees of the Class Vehicles, including Plaintiff, have suffered an ascertainable loss of money and/or property and/or loss in value. The unfair and deceptive trade practices committed by Defendant caused Plaintiff and the members of the Class damages, including but not limited to, loss of value, loss of use of the vehicles, and battery replacement and other repair costs.

9.     Accordingly, Plaintiff brings this action to redress Defendant's misconduct. Plaintiff seeks recovery of damages and a repair under state consumer-protection statutes and applicable express and implied warranties, and reimbursement of all expenses associated with the repair or replacement of the Class Vehicle.

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§1332(d)(2) and (6) because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.

11.     Subject matter jurisdiction is also proper in this Court has supplemental subject matter jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

12.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and because Plaintiff purchased the vehicle at issue in this District. Defendant advertised in this District and received substantial revenue and profits from sales and/or leases of the Class Vehicles in this District. Therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this District.

13.     This Court has personal jurisdiction over Defendant by virtue of its transactions and business conducted in this judicial district. Defendant has transacted and done business, and violated statutory and common law, in the State of California and in this District.

**INTRADISTRICT CASE ASSIGNMENT**

14.     Pursuant to Civil Local Rule 3-2(c), an intra-district assignment to the San Francisco or Oakland Division is appropriate because a substantial part of the events or omissions which give rise to the claims asserted herein occurred in this Division, including that Plaintiff Raynaldo made his purchase of his 2017 Honda Accord in San Francisco, California.

**PARTIES**

**A.     Plaintiff**

15.     Plaintiff Ronald Raynaldo is a citizen of California and resides in San Francisco, California. Plaintiff purchased a 2017 Honda Accord, VIN 1HGCR2F57HA112027 from San Francisco Honda, located at 1395 Van Ness Avenue, San Francisco, California 94109 in April 2019.

16.      San Francisco Honda is part of Honda's network of authorized dealers across the United States. Honda features San Francisco Honda on its website as an authorized dealer, with links to lists of inventory of Honda vehicles on its website.

17.      When shopping for his Class Vehicle, Plaintiff researched and considered the reliability and quality of the make and manufacturer, and has purchased Honda's in the past so Plaintiff was familiar with Honda's representations about Honda's quality, safety and warranties.

18.      Prior to purchasing his Class Vehicle, Plaintiff was aware of and/or reviewed Honda's promotional materials on the internet and/or at San Francisco Honda, saw stickers the dealer placed on the vehicle, and interacted with Honda sales agents at San Francisco Honda—each of which information sources failed to disclose the presence of the Defect in 2017 Honda Accord models or the other Class Vehicles.

19.      Through his exposure and interaction with Honda, Plaintiff was aware of Honda's uniform and nationwide marketing message that its vehicles are safe and dependable, which was material to his decision to purchase his Class Vehicle. When he purchased the vehicle, he believed, based on Honda's marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his vehicle did Honda disclose to him that his vehicle was not safe or dependable, or that it suffered from the parasitic draw Defect, which creates safety risks and renders the vehicle useless.

20.      Plaintiff purchased his Class Vehicle with the parasitic draw Defect as part of a transaction in which Honda did not disclose material facts related to the automobile's essential purpose – safe and dependable transportation. Plaintiff did not receive the benefit of his bargain. He purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The parasitic draw Defect has significantly diminished the value of Plaintiff's Class Vehicle.

21.      Had Honda disclosed the Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

22.    Plaintiff would purchase another Honda from Honda in the future if Defendant's representations about the vehicle, including its safety and durability, were accurate.

**B.    Defendant**

23.    Defendant American Honda Motor Company, Inc. ("Honda") is incorporated in California with its principal place of business in Torrance, California. Honda is the wholly owned subsidiary in North America of Honda Motor Company Limited ("HML"), a Japanese corporation. Honda began operations in 1959 and is now responsible for "[s]ales, marketing, service, distribution, import and export of Honda and Acura products in the U.S."[2]

24.    The Honda Development & Manufacturing of America, LLC ("HDMA") and Honda R&D Americas, LLC ("HRA") are affiliated with Honda, and operate 19 major manufacturing plants in North America and 14 major research and development centers in North America which jointly fully design, develop and engineer many of the products the company makes in North America.

25.    Honda is a holding company of sales, manufacturing, engineering, design, and research and development strategies of HML in the United States. Honda is in the business of designing, engineering, testing, validating, manufacturing, distributing, marketing, selling, and servicing Honda and Acura branded vehicles in the United States through its hundreds of dealerships.

26.    At its Torrance, California headquarters, Honda reportedly combines product sales, service, and coordinating functions for HML in North America, and is responsible for the manufacture, development, distribution, marketing, sales, and servicing of Honda vehicles. The decisions regarding the marketing and sale of the Class Vehicles, the development of the internal Service Bulletins relating to the parasitic draw Defect in the Class Vehicles, and decisions regarding the disclosure or non-disclosure of the Defect were in whole or substantial part made by Honda at its Torrance headquarters. For example, in addition to Honda's C-Suite, Honda's Vice President of Marketing & Customer Experience (responsible for "overseeing marketing and public relations for

---

[2] Available at https://hondanews.com/en-US/honda-corporate/releases/release-554e3d8539c7f6db3b88b571930280ab-honda-2020-digital-factbook (last accessed July 27, 2021).

both the Honda and Acura automobile brands as well as the company's customer experience initiatives"),[3] Assistant Vice President of Honda's Marketing Division (responsible for "leading the company's marketing efforts for both the Honda and Acura automobile brands"),[4] Vice President of the Automobile Sales Strategy Division (responsible for Honda's "market representation, sales and production planning, certified pre-owned sales, dealer communication, product and sales information, as well as export sales and distribution.");[5] Vice President of the Product Regulatory Office (responsible for "overseeing the U.S. regulatory compliance activities for all automobile…products, including the areas of product safety, environmental strategy, and energy reporting and compliance");[6] the Division Head of Product Safety (responsible for responsible for automobile "product safety, including compliance with the [TREAD] Act [49 U.S.C. § 30118]," "compliance with government regulations," and managing "Honda's relationship with U.S. government agencies, including the National Highway Traffic Safety Administration [("NHTSA")]… on matters related to incident reporting, safety investigations, and product recall management");[7] and Honda's Manager of Auto Campaigns and Recalls (responsible for communicating with Honda dealerships concerning potential defects in Honda vehicles and overseeing internal investigations)[8] are each based in Torrance.

27.    Honda's warranty and customer service departments for Honda vehicle owners and lessees are operated from the Torrance headquarters.[9]

---

[3] https://hondanews.com/en-US/releases/jay-joseph-bio (last accessed July 27, 2021).

[4] https://hondanews.com/en-US/releases/ed-beadle (last accessed July 27, 2021).

[5] https://hondanews.com/en-US/releases/steven-center (last accessed July 27, 2021).

[6] https://hondanews.com/en-US/releases/jenny-gilger-bio (last accessed July 27, 2021).

[7] https://www.linkedin.com/in/jeff-chang-2a0195107/ (last accessed July 27, 2021).

[8] https://www.linkedin.com/in/brad-ortloff-7210039a/ (last accessed July 27, 2021); *see also* https://static.nhtsa.gov/odi/tsbs/2019/MC-10156621-0001.pdf (last accessed July 27, 2021).

[9] *See* https://automobiles.honda.com/information/customer-relations#:~:text=Call%201%2D866%2D864%2D5211 (last accessed July 27,2021); https://direct.automobiles.honda.com/information/customer-relations.aspx (last accessed July 27, 2021).

## SUBSTANTIVE ALLEGATIONS

A.    **Honda Controls The U.S. Auto Market Based On Years Of Emphasizing The Quality And Reliability Of Its Vehicles**

28.    Passenger cars such as the Accord and Civic, and light trucks (such as the CR-V, Odyssey and Pilot) are Honda's principal automobile models in the United States.  More than half of all HML's global revenue from 2018 to 2020 were from North American sales.

29.    The Accord, first introduced in 1976, is now up to its tenth generation; the ninth generation was released in 2013, and the tenth generation was released in 2018.

30.    The Honda CR-V is a compact crossover SUV, first sold in Japan in 1995 and introduced into the United States market in 1997, selling 66,000 vehicles in its first year.  Honda's 2017 CR-V introduced the fifth generation of the vehicle.

31.    Honda is at the top of automakers in the United States in terms of sales.

32.    In 2019 and 2020, Honda sold 1.34 million and 1.6 million vehicles, respectively.[10]

33.    In 2019, more than 90 percent of the Honda and Acura automobiles sold in the U.S. were produced in North America.[11]

34.    The Accord has been Honda's third bestselling vehicle, selling over 199,000 vehicles and over 267,000 vehicles in 2019 and 2020, respectively. [12]  The CR-V has been Honda's best-selling vehicle in the United States for eight straight years, selling over 333,000 vehicles in 2020, and over 384,000 vehicles in 2019.[13]

35.    A McKinsey & Company report noted that over twice as many second-owner used vehicles are sold in the United States each year compared to new vehicles.[14]

---

[10] https://www.best-selling-cars.com/usa/2020-full-year-usa-honda-and-acura-sales-by-model/ (last accessed July 27, 2021).

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] https://www.mckinsey.com/industries/automotive-and-assembly/our-insights/used-cars-new-platforms-accelerating-sales-in-a-digitally-disrupted-market#  (last accessed July 27, 2021).

36.    Honda has metamorphosized into such a large player in the U.S. auto-market based on its assurances to consumers of care, durability, and quality. Consistent with its marketing and public statements, Honda falsely represents its vehicles as safe and dependable so that consumers can rely upon the build and quality of the vehicles for daily use.

37.    Honda dedicates a page on its website entitled "safety," where Honda represents the safety of its vehicles.[15] Therein, Honda states that it conducts "Virtual & Real-World Tests," and touts that it has "developed two of the world's most advanced crash-test facilities — including the largest ever built and first to allow multi-directional crashes." Further, Honda states that it also "dreamt bigger to create some of the most advanced virtual crash tests in the world. All this combines to make safer roads for everyone."

38.    Notwithstanding the presence of the Defect in millions of Class Vehicles which prevents drivers from starting their engines and can cause engine stalls, Honda calls itself "a mobility company—we move people. But, for us, safety is an enormous priority. We don't just want to move you; we want to move you safely."[16]

39.    In addition to the real-world test performed at the "most advanced crash-test facilities," Honda "supplement[s] these tests" with "software that results in extremely reliable, accurate, and cost-effective crash simulations." [17] Honda claims that the safety testing procedures it utilizes "allows [it] to make the road safer for everybody on it by engineering for worst case scenarios in an unprecedented way."

40.    A "rugged" webpage on Honda's website represents that Honda conducts "cold-weather testing," including "on 23 different driving courses in the frozen prairies of Northern Minnesota" and in "-40-degree cold cells."[18] Further, Honda states that it "test[s] everything" at "the Honda Proving Center of California, spanning 3,840 acres of sun-scorched desert."

---

[15] https://www.honda.com/safety (last accessed July 27, 2021).

[16] https://www.honda.com/safety/virtual-and-real-world-tests (last accessed July 27, 2021).

[17] *Id*.

[18] https://automobiles.honda.com/rugged (last accessed July 27, 2021).

41.     The consistently uniform marketing message from Honda concerning the reliability of its vehicles is also found in the marketing materials unique to the Class Vehicles.

42.     In the brochure for Honda's "all-new 2017 CR-V," Honda states that "the bar has been raised again" and that the CR-V sets "the new standard in comfort, style and versatility." Honda marketed the CR-V as "[a] vehicle designed for a superior driving experience makes for better exploration of the roads ahead[,]" "delivering a wealth of standard features and driver and passenger conveniences[.]"[19]

43.     Even in the face of the known parasitic draw Defect in the vehicle, Honda proclaimed the CR-V's reliability with the slogan: "Because no matter where you're going, there's always more to do, more to see, and more to experience—every day."

44.     In addition, Honda stated that the vehicle provides "a stand-out experience" because "[e]very surface, every contour, and every feature has been thoughtfully designed to create a truly superior driving experience in every sense." In light of all these purported safety features and attention to detail, Honda instructs drivers to "commute with confidence."

45.     Featured prominently in Honda's marketing materials are claims of excellence in quality, design, safety and reliability.

46.     For example, in its brochure for the 2018 Accord, Honda states that the vehicle is "[t]he most impressive Honda ever":[20]



---

[19] https://automobiles.honda.com/-/media/Honda-Automobiles/Vehicles/2017/Accord-Coupe/Brochure/V3/MY17-Accord-Wave-2-Model-Site.pdf (last accessed July 27, 2021).

[20] https://pictures.dealer.com/rivertownhonda/8b4ec4800a0e0ca37432ffaa8919ba2f.pdf (last accessed July 27, 2021).

47.    Additional representations about reliability related topics include affirmative promises that the vehicle was "[b]uilt for what-if" and is "[a]t the forefront of safety":[21]

48.    Honda similarly represented that the 2018 CR-V is a dependable vehicle. In the brochure for the vehicle, Honda against states that drivers should "[c]ommute with confidence" and that there is "[e]xcellence in every detail."[22]

49.    The 2019 CR-V was promoted by Honda as a reliable vehicle with the slogan "Enhance Every Day," "Monday" through "Sunday[,] [p]eace of mind, from here to everywhere":[23]



---

[21] *Id.*

[22] https://automobiles.honda.com/-/media/Honda-Automobiles/Vehicles/2018/CR-V/2018-Updates/Brochure/MY18_CR-V_Brochure_Online_Mech1.pdf (last accessed July 27, 2021).

[23] https://web.archive.org/web/20190218165632if_/https://automobiles.honda.com/cr-v#features (last accessed July 27, 2021).



**B.** **Parasitic Draining in Vehicles Creates An Unreasonable Risk Of Failure Of Mandated Safety Features And Engine Stalls.**

50.     In some fashion, vehicles today are feats of electrical coordination, no longer simply mechanical machines.  This additional technology and electric power to make the vehicle function requires electricity to maintain federal and state mandated safety features, as well as to allow the vehicle to function for its intended purpose, which is  transporting consumers where they need to go and safely.

51.     A vehicle's electrical components are powered by its battery and, when the engine is running, the alternator. When operated, the alternator also charges the vehicle's battery at a specified voltage level.

52.     When a vehicle is parked and turned off, the battery is the vehicle's only source of power. Consequently, the vehicle relies on a minimum level of electricity stored in its battery to start the engine and operate. Specifically, the vehicle's sparkplugs which run the engine and the starter which cranks the engine rely on the battery when the vehicle is off.

53.     Additionally, in order "to reduce traffic accidents and deaths and injuries resulting from traffic accidents," automobile manufacturers are required to include certain core safety features in their vehicles that rely on battery power.[24]  For example, reliable emergency hazard

_____

[24] 49 C.F.R. § 571.108.

warning signal lights, headlights, and taillights must be found in all passenger cars sold in the United States.[25]

54.   Other safety components that rely on engine-off battery usage are defrosters, door locks, alarm systems, interior lights, windshield wipers, and internal computer modules which store engine diagnostic codes, fuel economy adjustments, and other essential information.

55.   When the engine is off some of these components slowly draw on the battery's stored electricity. Once the engine is started, the alternator begins to replenish the minimal amount of electricity that the emergency features pulled from the battery while in the off state.

56.   A vehicle's alternator is not designed to generate power with the engine off, therefore all electricity used from the battery when the alternator is not running is a parasitic or one-way electrical drain. Over an extended period of time parasitic draws will deplete a vehicle's battery.

57.   Due to the reliance of multiple emergency safety features and the starter on a minimum amount of electricity stored in the battery, modern vehicles are designed so that this amount of draw does not significantly discharge a healthy battery below the amount necessary to perform its basic functions. [26]

58.   If a vehicle experience constant parasitic drawing, the vehicle's battery will be under constant strain and its performance with degrade until total obsolescence.  That is because vehicle batteries have a certain amount of "duty cycles"—*i.e.*, the recharging of a depleted battery—before it becomes unable to store the minimal amount of electricity required to perform its function. With each depletion, the battery becomes weaker and is unable to store as much electricity. This reduced capacity is irreversible and no amount jump-starts or recharging through the alternator will repair the battery.

---

[25] *Id.*; *see also* Cal. Veh. Code §§ 24250, 24400 (motor vehicles in California must be equipped with at least two headlights which must be used during "darkness" or "inclement weather").

[26] For example, vehicles are now designed with precautionary systems to detect unintended draws occurring while the vehicle is off, including audible and visual alarms which notify drivers when lights are left on.  Most instances of unintended parasitic draining are not detectable and the driver's safety is at risk without their knowledge.

59.     Prior to the inevitable complete failure of a battery, excessive parasitic draining can cause key safety components (*e.g.*, hazard lights, headlights, and taillights) to fail, including when the vehicle is being driven.  For example, as the battery degrades, the dashboard, headlights, and hazard lights can flicker and dim due to poor electricity flow coming from the battery and/or alternator.[27]

60.     Because parasitic draining results in depleted batteries, the alternator is utilized to replenish the battery's power at a higher than usual rate, resulting in the failure of the alternator's internal electrical component and bearing. When that occurs, the alternator generates a reduced amount of power until the point when it ultimately fails. As the alternator's ability to generate power degrades, there is an increasing risk that the vehicle's engine will unexpectedly stall.[28]

61.     Also, when a vehicle loses its engine control module data due to battery depletion, the vehicle may experience reduced engine performance, reduced fuel economy, and increased emissions.

62.     The amount of draw that a vehicle requires to turn the engine on and operate core safety features is low, typically amounting to no more than a total trickle of 25 to 40 milliamperes (mA). When a vehicle battery experiences an expected draw within this range, the battery should last months without the need to recharge itself from the alternator or receive a jump-start. Moreover, the life and operation of the battery and wider electrical system are not detrimentally impacted.

63.     A battery installed in car today should last a driver six years, with some lasting nearly twice that amount, so long as the battery is not subject to excessive parasitic drawing.[29] The

---

[27] *See*     https://www.mysynchrony.com/blog/automotive/6-signs-your-car-battery-needs-to-be-replaced.html#:~:text=If%20your%20headlights%20dim%20while,again%20in%20the%20near%20future (last accessed July 27, 2021).

[28] *See*  https://repairpal.com/symptoms/why-is-my-car-stalling  (last accessed July 27, 2021); https://aamcominnesota.com/alternator-trouble-signs/ (last accessed July 27, 2021).

[29] *See*     https://www.kbb.com/battery-replacement/     (last     accessed     July     27,     2021); https://www.aaa.com/autorepair/articles/how-long-do-car-batteries-last  (last accessed July 27, 2021); https://www.rd.com/article/how-long-do-car-batteries-last/ (last accessed July 27, 2021).

cost to replace a vehicle battery typically varies from $45 to $250,[30] and the cost of a replacement alternator with repair fees can vary between $200 to $800.[31]

**C.    Over Two Million Class Vehicles Suffering From The Parasitic Draw Defect Were Sold by Honda**

64.    Honda, upon information and belief based on the facts alleged herein, has knowingly sold over two million of Class Vehicles which suffer from a serious parasitic draw Defect. The Defect provides no discernable warning to drivers and thus creates an unreasonable risk to each driver.

65.    Scores of complaints submitted to NHTSA reveal the magnitude of the Defect's impact of the Class Vehicles and consumers.

66.    Attached at Exhibit 1 hereto is a list of representative complaints filed with NHTSA detailing the parasitic draw Defect found in the 2017 Honda CR-V Class Vehicles: [32]

67.    Attached at Exhibit 2 is a list of representative complaints filed with NHTSA detailing the parasitic draw Defect found in the 2018 Honda CR-V Class Vehicles.

68.    Attached as Exhibit 3 is a list of representative complaints filed with NHTSA detailing the parasitic draw Defect found in the 2019 Honda CR-V Class Vehicles.

69.    Attached as Exhibit 4 is a list of representative complaints filed with NHTSA concerning the parasitic draw Defect found in the 2016 Honda Accord Class Vehicles.

70.    Attached as Exhibit 5 is a representative list of complaints filed with NHTSA detailing the parasitic draw Defect found in the 2017 Honda Accord Class Vehicles.

71.    Attached as Exhibit 6 is a list of representative complaints filed with NHTSA detailing the parasitic draw Defect found in the 2018 Honda Accord Class Vehicles.

---

[30] *See* https://www.kbb.com/battery-replacement/ (last accessed July 27, 2021).

[31] *See*    https://shop.advanceautoparts.com/r/advice/car-maintenance/how-much-does-it-cost-to-replace-an-alternator (last accessed July 27, 2021).

[32] NHTSA complaints are publicly available online and searchable by NHTSA ID Number at https://www.nhtsa.gov/recalls.

**D.**   **Plaintiff's Class Vehicle Suffers From The Parasitic Draw Defect**

72.     Shortly after purchasing his used 2017 Honda Accord, Plaintiff first experienced an issue caused by the parasitic draw Defect in his Class Vehicle—although he was unaware of the cause at the time. Ultimately, Plaintiff found his vehicle had a dead battery and was unable to start. On multiple occasions, Plaintiff has had to jump start his 2017 Honda Accord, and continues to notice electrical issues such as with his automatic windows.

**E.**   **Honda Knew That The Class Vehicles Suffered From The Defect Prior To Its Sale Of The Class Vehicles.**

73.     Defendant, based on the facts alleged herein and on information and belief, had full knowledge of the existence of the Defect and the risk it posed to Class Vehicle owners and lessees. This knowledge is based upon, among other facts:: (1) Honda's pre-sale durability testing and part sales, (2) records of customer complaints provided to Honda; (3)  NHTSA complaints; (4) dealership repair records; (5) consumer complaints posted on the internet; and (6) warranty and post-warranty claims.

74.     Honda is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Honda conducts tests, including pre-sale durability testing, on incoming components, including for parasitic draws, to verify the parts are free from defects and align with its specifications.

75.     Honda emphasizes its Global Honda Quality Standard ("G-HQS"), which it claims "continuously enhances quality at every stage, encompassing design, development, production, sales and after-sales service in order to realize products offering a new level of outstanding quality."[33] Honda adds: "This initiative aims to achieve the highest quality through the creation of drawings designed to facilitate manufacturing, as well as develop manufacturing control techniques that limit process variability, by applying and reflecting design and development expertise at the production preparation and production (mass-production) stages."[34]

---

[33] Honda Sustainability Report 2018, available at https://global.honda/content/dam/site/global/about/cq_img/sustainability/report/pdf/2018/Honda-SR-2018-en-065-078.pdf (last accessed July 27, 2021).

[34] *Id.*

76.     As part of this initiative, Honda "Assur[es] Long-Term Reliability through Rigorous Durability Testing":[35]

> Honda subjects new and redesigned models to a rigorous regimen of long-distance durability testing before beginning mass production to verify that there are no quality issues.

> Honda also disassembles vehicles used in the test drives into every single part and verifies that there are no quality issues through a process consisting of several thousand checks. By accumulating data on the issues discovered through these test drives and detailed inspections as well as associated countermeasures, the Company is able to ensure a high level of quality and reliability.

77.     "Honda's production departments establish manufacturing control items and criteria for each part, process and operation to prevent product quality issues[,]" conducts extensive on-site audits of its suppliers for quality assurance, and "then works to improve part quality through activities that emphasize communication with suppliers, for example, by sharing audit results and cooperating to identify opportunities for quality improvement."[36]

78.     In addition to the "quality assurance system" put in place by the G-HQS related to the production and manufacturing of the Class Vehicles, Honda has in place procedures to investigate "issues after sales;" namely, through its dealerships: [37]   Honda has an interconnected network of customer service departments worldwide through which it relies upon to monitor quality control issues.

79.     Honda's California headquarters also maintain a Technical Research & Support ("TRS") Group responsible for, *inter alia*, identifying and investigating potential defects in Honda vehicles.

80.     Honda also regularly monitors the NHTSA databases for consumer complaints as part of its ongoing obligation pursuant to the TREAD Act, 49 U.S.C. § 30118, to identify potential defects in its vehicle. As shown above, numerous complaints filed by Class Vehicle owners with

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

NHTSA establish that Honda knew, or should have known, of the Defect *at least* as early as March

2017 (NHTSA ID No.: 11005067), based on publicly available information.

81.    Indeed, given Honda's history of skirting its monitoring obligation under the

TREAD Act and subsequent fine, Honda was likely acutely aware of (or should have been) each

NHTSA customer complaint regarding the parasitic draw Defect. Specifically, in 2015, Honda was

fined $70 million (the highest penalty allowed by Congress) by NHTSA "for failing to report

deaths, injuries, and certain warranty claims to the federal government in violation of the TREAD

Act" from 2003 through 2014.[38] As part of the Consent Order "Honda also agreed to increased

NHTSA oversight and third party audits to ensure that all required reporting is completed[.]"

82.    In addition to NHTSA complaints, customer complaints of the parasitic drain Defect

in Class Vehicles can be found on various consumer websites and message boards.

83.    For example, one consumer or member of the public stated on March 9, 2017:

"There have been several posts about battery problems on 2017's. Starting it every day is nuts.

Horrible advice. My vehicles routinely sit for two weeks or more without running them. Never ever

had problems. Summer or winter. Keep pushing your dealer on this."[39]

84.    On May 15, 2017, another consumer reported: [40]

> Today is the second time we've had the exact problem described--
> dead battery on a '17 CR-V, in our case from 55 hours of not being
> driven. We even joked about it over the weekend, while running
> errands in our 2009 Fit, "hope the CR-V still starts on Monday!" It
> did not not start on Monday. (The other case was when trying to
> install the super tight OEM rear seat covers with all the lights on for
> a few hours. Which still seemed suspiciously short to kill a battery,
> but after waiting a few hours it did start at least.)
>
> ***We bought this to be a second, family car, on the reputation*** built
> from having purchased our '09 Fit Sport in 2008, and having never
> had a moment's issue with it.
>
> ***With a new baby joining the family in 3 weeks, I can't imagine how
> I'm going to put my faith in this car for emergencies***. I shouldn't
> have to recreate the scene from Apollo 13 where they're working to

---

[38] https://one.nhtsa.gov/About+NHTSA/Press+Releases/2015/DOT-fines-Honda-$70-million (last accessed July 27, 2021).

[39] *Id.*

[40] *Id.*

boot up the lunar module in just the right sequence so as to not overload the batteries--it's an automobile, not a trip to space.

Not much to add to what the previous posters have stated, dealer service sounds confused when we call, and I'm sure won't find anything when we get it to them tomorrow. Will be sure to ask for Honda Tech Line Summary ATS 170301. *For what it's worth, we religiously set the electronic parking brake every single time we park, so I don't know what more can be done except buying a battery-operated jumpstarter.* …

85.     Multiple customer reports of the Defect in Class Vehicles were also posted on *carcomplaints.com.* For example, May 20, 2019, the owner of a 2019 CR-V complained that her vehicle "stall[ed] out" at least three times in a matter of weeks.[41] The owner reported that her vehicle first stalled when she was driving 10-15 mph in her work parking lot. Three weeks later, as she was driving 60 mph on a highway, the vehicle "completely died with no warning lights or indication." Moreover, she lost power steering and the engine would not start again. A week later, after dropping off her vehicle at the Honda dealership, the vehicle stalled for a third time. This time, the driver reported that the CR-V "completely stalled out again" while driving, "leaving [her] in danger of" getting hit by other vehicles.

86.     Other Class Vehicle owners complained of their vehicle's stalling. For example, on March 11, 2019, an owner complained that their "2017 CRV died on highway" while traveling 65 mph, which "almost caused an accident," and the vehicle "had to be towed" to the dealership.[42]

87.     On January 22, 2019, the owner of a 2019 CR-V stated: "Dead Battery. Called Honda Roadside Assist and they said 'I left the lights on'. I didn't think I had, but hey, I'm human and it could have happened."[43] Six days later, the same owner provided an update: "Again dead battery after not driving the car for a couple of days. This time, towed to dealership. They couldn't find any problem. Basically, I had to wait for the problem again."[44]

---

[41] https://www.carcomplaints.com/Honda/CR-V/2019/engine/stalls_while_driving.shtml     (last accessed July 27, 2021).

[42] https://www.crvownersclub.com/threads/2017-crv-died-on-highway-almost-caused-an-accident-had-to-be-towed.196481/ (last accessed July 27, 2021).

[43] https://www.carcomplaints.com/Honda/CR-V/2019/electrical/dead_battery.shtml (last accessed July 27, 2021).

[44] *Id.*

88.     On March 11, 2019, another owner of a 2019 Honda CR-V bemoaned the need for three replacement batteries in a new vehicle: [45]

> Battery was dead on two occasions within the first 800 miles of ownership. Dealer replaced the battery under warranty and about 5 weeks later the same problem is back. Battery discharges after sitting unused for two days. Will be calling the dealer for an appointment once the battery is charged and I can start the SUV.

> Three dead batteries within the first 2 2/2 months of ownership. Have purchased a new battery charger and now carry a LI-ION battery starter in the vehicle. So much for Honda reliability; never again.

89.     A third owner recounted the extreme difficulties he encountered after purchasing a new 2019 Honda CR-V on February 14, 2019, as well as the health and safety risk it posed to him. [46] The owner complained that the parasitic draw Defect resulted in the depletion of his battery which "caused [him] to miss an out of town Dr.'s appointment." Over the course of the next two weeks, the owner experienced multiple incidents of failed batteries and brought his vehicle to a Honda dealership. Despite the dealership purporting to fix the issue, the vehicle was no more reliable. The owner lamented that he was unable to rely on his new vehicle to drive to other medical appointments and was forced to borrow other vehicles to get to his scheduled medical tests. [47]

90.     Similar complaints of the Defect were posted on *carcomplaints.com* for other Class Vehicles. On October 1, 2018, a 2018 Honda CR-V owner complained of having to replace the battery in his vehicle six times since purchasing the car in April of the same year. The owner noted that "[t]he mechanics at [his] local Honda dealership say they know it is a problem; however, there is nothing they can do about it except keep replacing our battery." [48]

91.     A consumer message board, known as *CRVOwnersClub.com* exists, and [upon info and belief] is a location where Honda reviews and provides feedback to consumer complaints . [49]

---

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] https://www.carcomplaints.com/Honda/CR-V/2018/electrical/battery_drain.shtml (last accessed July 27, 2021).

[49] *See*    https://www.crvownersclub.com/threads/2017-crv-battery-going-dead-overnight.135193/ (May 15, 2017 post by "Honda Automobile Customer Service[,] American Honda Motor Co., Inc." in response to a customer complaint concerning the Defect) (last accessed July 27, 2021).

It is also routine for retailers such as Honda to have a customer relations division that receives and responds to customer calls concerning, *inter alia*, product defects. Plaintiff alleges that these sources also put Honda on notice of the Defect and its danger.

92.     On information and belief, Honda's customer relations department, which interacts with authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues, has received numerous reports of the parasitic draw Defect and premature wear on Class Vehicle batteries. Customer relations also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

93.     Honda's warranty department similarly reviews and analyzes warranty data submitted by its dealerships and authorized technicians in order to identify defect trends in its vehicles.

94.     Honda dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide Defendant with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case Honda later determines to audit the dealership or otherwise verify the warranty repair.

95.     For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to Honda because Honda will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

96.     Honda knew or should have known about the Defect and risk of premature battery wear because of the high number of replacement parts and batteries it is reasonable to infer were ordered from Honda. All of Honda's service centers are required to order replacement parts, including batteries directly from Honda. Other independent vehicle repair shops that service Class Vehicles also order replacement parts directly from Honda.

97.     Honda routinely monitors part sales reports and are responsible for shipping parts requested by dealerships and technicians. Thus, Honda has detailed, accurate, and real-time data regarding the number and frequency of replacement part orders. The increase in orders of batteries

and other auto-parts necessary to fix damage caused by the parasitic draw Defect the Class Vehicles was known to Defendant and should have alerted it to the scope and severity of the Defect.

98.     Furthermore, the existence of the Defect in the Class Vehicles can hardly come as a surprise to Honda given prior model years of the Class Vehicle are known to experience similar parasitic draining issues.  There are many customer complaints filed with NHTSA prior to the sale of the Class Vehicles regarding parasitic draining issues found in prior versions of the Class Vehicle.  Examples include:

- NHTSA ID No.: 10862600 (dated May 2, 2016) (2014 Honda CR-V owner complained: "we have 4 instances where we have been unable to start the CRV because of a low battery problem" and that after the Honda dealership performed a software update to remedy the problem "the same sub standard condition reoccurred.");

- NHTSA ID No.: 10889192 (dated June 30, 2016) (2013 Honda Accord owner complained: "[T]he engine failed to start and the navigational system failed intermittently. The vehicle was taken to the dealer where it was diagnosed that the ignition electrical system caused the battery to drain…. The dealer replaced the battery and the starter assembly; however, the failure was not corrected. The vehicle failed to start and the navigational system continued to fail."); and

- NHTSA ID No.: 10908883 (dated September 23, 2016) (2014 Honda CR-V owner complained: "Every 14-15 days, I am having to get a jump because the car would not start. I had the battery checked and was told that there is not problem with the battery.").

99.     NHTSA complaints of parasitic draw issues in earlier model years Class Vehicles were corroborated by other customer complaints found on the internet. For example, on October 30, 2015, an owner of a 2012 Honda CR-V complained that she "has been going through batteries at an alarming rate. Every time I put a new one in, it dies within a few weeks and can't be made to hold a charge. This is a totally unacceptable problem to have in a vehicle that only has 20,000 miles on it! I have gone through 4 batteries and enough is enough. What is the problem and how can I prevent more batteries from biting the dust?"[50]

---

[50] https://www.yourmechanic.com/question/going-through-too-many-batteries (last accessed July 27, 2021).

100.     In February 2012, an owner of a 2012 Honda Accord complained on a popular car website, *Edmunds.com*, that his vehicle's battery was constantly draining without explanation: "Only 1600 miles, I sent my car to the dealer 2 times and jumping start 3 times already. They just told me everything is OK. Something is eating my battery power."[51]

101.     On October 21, 2013, an owner of a 2014 Honda CR-V reported on *carcomplaints.com* that his vehicle experienced the same issue: "Parked car at the airport for 16 days, returned and found battery dead. Would not turn over. Dealer said that is a common problem, they did not want to fix it. Returned again after the same issue, made them do a draw test and retested the battery."[52]

**F.     Honda's Service Bulletins Fail to Fix the Defect**

102.     On February 22, 2017, Honda filed an "Engineering Request for Investigation" (the "Engineering Request") with NHTSA. In the Engineering Request, Honda stated that it "is investigating certain 2016-2017 Accord V6s with a customer complaint of a no-start condition that requires the 12V battery to be replaced. To fully understand the cause of this condition, [Honda] would like to collect specific parts from the vehicle prior to you attempting a repair of any kind."[53] Instructions were provided to have Dealers contact Honda's TRS Group for further information.

103.     On February 23, 2017, Honda issued a "Dealer Message" with similar information.[54] Neither document identified the basis for Honda's decision to collect the vehicle batteries other than an unidentified number of customer complaints.

104.     Over the course of the next three months (on dates including March 6, 16, and 27, 2017, and June 30, 2017), Honda issued additional "Dealer Message[s]" concerning "customer

---

[51] https://forums.edmunds.com/discussion/14504/honda/accord/2012-honda-civic-and-accord-battery-drain (last accessed July 27, 2021).

[52] https://www.carcomplaints.com/Honda/CR-V/2014/electrical/dead_battery.shtml (last accessed July 27, 2021).

[53] NHTSA ID No.: 10108050, Manufacturer Communication Number: AER17020B, available at https://static.nhtsa.gov/odi/tsbs/2017/MC-10108050-9340.pdf.

[54] NHTSA ID No.: 10108052, Manufacturer Communication Number: APAS02232017901, available at https://static.nhtsa.gov/odi/tsbs/2017/MC-10108052-9340.pdf.

complaint[s] of a no-start condition that requires the 12V battery to be replaced" in 2016-2017 Accords. [55]

105.    Indeed, on March 10, 2017, Honda issued a "Tech Line Summary Article" notifying dealerships that it had conducted an "investigation" into 2017 CR-Vs being brought in for weak or dead batteries, yet the vehicles and battery "check out ok." [56] Honda stated that it "found that a software bug in the VSA [Vehicle Stability Assist] system may be keeping it awake when the ignition is turned to OFF. This can cause a 350 mA parasitic draw that may result in a weak or dead battery." Honda noted that it "found that this issue appears to happen only when a certain shut down procedure is done, and it's rare when it does." Although it acknowledged the issue, Honda did not have a "fix;" and instead warned that "this parasitic draw can be avoided by setting the electric parking brake before turning the ignition to OFF."

106.    Honda issued Service Bulletin 17-032[57] on June 14, 2017, which warned dealerships that 2017 CR-Vs "may have an intermittent 350mA current draw after the vehicle is shut off[,]" in which case "[t]he vehicle does not start due to a low battery." Honda stated that the "possible causes" for the parasitic draw was the vehicle's VSA modulator-control unit: "The VSA software logic may not allow the VSA modulator-control unit to shut down correctly and go into sleep mode after the vehicle is shut off. This can happen if the electronic parking brake (EPB) is applied within 3 to 4 seconds of the vehicle being shut off or if the EPB switch is held for a 3 to 4 second duration when the vehicle is off."   Honda's proposed "corrective action" was to "[u]pdate the VSA modulator-control unit, do the VSA sensor neutral position memorization (ALL SENSOR), set the

---

[55] March 6, 2017 (NHTSA ID No.: 10108266, Manufacturer Communication Number: APAS03062017901, available at https://static.nhtsa.gov/odi/tsbs/2017/MC-10108266-9340.pdf); March 16, 2017 (NHTSA ID No.: 10108293, Manufacturer Communication Number: APAS03162017901, available at https://static.nhtsa.gov/odi/tsbs/2017/MC-10108293-9340.pdf); March 27, 2017 (NHTSA ID No.: 10108331, Manufacturer Communication Number: APAS03272017901, available at https://static.nhtsa.gov/odi/tsbs/2017/MC-10108331-9340.pdf); June 30, 2017 (NHTSA ID No.: 10108299, Manufacturer Communication Number: APAS03222017901, available at https://static.nhtsa.gov/odi/tsbs/2017/MC-10108299-9340.pdf).

[56] NHTSA ID No.: 10108281, Manufacturer Communication Number: ATS170301, available at https://static.nhtsa.gov/odi/tsbs/2017/MC-10108281-9340.pdf

[57] NHTSA ID No.: 10108868; available at https://static.nhtsa.gov/odi/tsbs/2017/MC-10108868-9999.pdf.

tire pressures to the driver's door jamb label cold inflation values, and do the TPMS calibration procedure."

107.     On October 24, 2018, Honda announced that it had launched a battery collection program for 2017-2018 CR-Vs.[58] Honda's "Service Engineering" group sent a message to "Honda Dealers," instructing the Dealers to ship the batteries to Honda and to contact Honda's TRS Group for more information if the dealership "placed an OEM battery on a qualified vehicle."

108.     On March 29, 2019, Honda issued Service Bulletin 19-039, warning that 2019 CR-Vs may "fail[] to start after being parked for an extended period."[59] Honda explained that "[a]fter the vehicle is parked for an extended period, the PCM begins an evaporative system leak check after meeting certain criteria. Under certain conditions, it may not return to sleep mode, causing the battery to discharge."

109.     Also on March 29, 2019, a Honda "Manager of Auto Campaigns and Recalls" issued a communication to dealers and "All Honda Sales, Service, & Parts Managers, and Personnel," "announcing a Product Update for certain 2019 CR-V vehicles to address a concern related to a possible low battery state of charge and/or no start after the vehicle has been parked."[60] Honda stated that the issue was related to "[t]he FI-ECU[, which] checks for EVAP leaks 5 hours after vehicle shutdown. Due to a programming error, this system may not go back into sleep mode afterwards. As a result, the battery may drain if this condition exists for an extended period of time." Honda acknowledged that the issue may necessitate a battery replacement.

110.     Honda issued a communication to Honda Service Managers on April 16, 2019, that "[Honda] has been collecting batteries from [2018-2019 Accords and 2017-2018 CR-Vs] under certain conditions. If you have replaced an OEM battery on a qualified vehicle, please follow the procedure below.[61] Service Managers were instructed to ship the batteries to Honda and to contact

---

[58] NHTSA ID No.: 10147183, Manufacturer Communication Number: APaS10242018901, available at https://static.nhtsa.gov/odi/tsbs/2018/MC-10147183-9999.pdf

[59] NHTSA ID No.: 10156620, Manufacturer Communication Number: A19-039, available at https://static.nhtsa.gov/odi/tsbs/2019/MC-10156620-0001.pdf.

[60] NHTSA ID No.: 10156621, Manufacturer Communication Number: ABOM03292019, available at https://static.nhtsa.gov/odi/tsbs/2019/MC-10156621-0001.pdf.

[61] NHTSA ID No.: 10159033, Manufacturer Communication Number: APaS04162019903,

CLASS ACTION COMPLAINT
Case No. 3:21-cv-05808

Honda's TRS Group for more information if the dealership "placed an OEM battery on a qualified vehicle."

111.    On August 30, 2019, issued an Owner Notification Letter for 2019 CR-Vs, warning: "After the vehicle is parked for an extended period, the powertrain control module (PCM) begins an evaporative system leak check after meeting certain criteria. Under certain conditions, the PCM will not return to sleep mode, and may ultimately result in a dead battery. This is not an indication of a leak in the evaporative system."[62]

112.    On December 17, 2019, Honda issued an update for Service Bulletin 19-039 which expanded the number of 2019 CR-Vs subject to the bulletin.[63]

113.    Notably, Honda is aware that the Service Bulletins and proposed remedies are insufficient and fail to correct the parasitic draw Defect found the Class Vehicles. Even after the Service Bulletins were issued and dealers applied the "corrective action[s]" to the Class Vehicles, drivers continued to report incidents of parasitic draining.[64]

114.    Additionally, years before Honda issued Service Bulletins and battery collections for the Class Vehicles, Honda acknowledged the existence of parasitic draw issues in prior model years of the Class Vehicle.

115.    On September 1, 2011, Honda issued Service Bulletin A11090M for vehicle models "'98 and later models with A/C," including 2006-2007 Accords and 1998-2012 CR-Vs, warning that a defect in the A/C relay may cause parasitic draining. [65] Specifically, Honda warned that "[d]ead battery after parking for a short time or overnight" was "caused by the A/C compressor clutch relay contacts intermittently sticking closed…. If it sticks when you turn off the ignition with

---

available at https://static.nhtsa.gov/odi/tsbs/2019/MC-10159033-0001.pdf.

[62] NHTSA ID No.: 10164478, Manufacturer Communication Number: ONLO4G08302019, available at https://static.nhtsa.gov/odi/tsbs/2019/MC-10164478-0002.pdf.

[63] NHTSA ID No.: 10169977, Manufacturer Communication Number: A19-039, available at https://static.nhtsa.gov/odi/tsbs/2019/MC-10169977-0001.pdf.

[64] *See*, *e.g.*, NHTSA ID Nos. 11187354, 11089119, 11191314, 11064100, 11089119.

[65] https://www.tsbsearch.com/Honda/A11090M (last accessed June 27, 2021).

1    the compressor running, the compressor clutch keeps drawing battery power at a rate of 2 to 4 amps.

2    That much parasitic draw discharges the battery in short order."

3    116.    On November 13, 2012, Honda issued a Service Bulletin, Service Bulletin 12-041,

4    titled: *The Battery Is Dead and Needs Multiple Jump-Starts*.[66] Therein, Honda acknowledged that

5    2012 Civics and 2012 CR-Vs that "sat for at least two days" are prone to dead batteries, which

6    require "multiple jump-starts to start the engine." Honda told its dealerships and technicians that

7    the "probable cause" of the dead batteries was related to "[t]he vehicle's battery sensor monitors

8    battery condition and the PCM [which] determines charging mode." Honda explained that "[b]ased

9    on the sulfation of the battery and customer driving habits the PCM may not select the correct

10    charge mode." Honda further warned that "[a] jump-start should only be used to get the vehicle to

11    a service station or dealer. It should not be used to fully charge the battery." The Service Bulletin

12    instructed Honda mechanics to replace the battery "if necessary" and to update the PCM's software.

13    117.    Next, on March 19, 2014, Honda issued a Service Bulletin [67] which superseded

14    Service Bulletin 12-041, issued on February 2, 2013. Therein, Honda states that the Service Bulletin

15    "has been revised extensively." Again, the "corrective action" proposed was to update the PCM

16    software, and that dealers should "[i]f necessary, replace the battery[.]" Honda further stated that

17    the PCM not selecting the correct charge mode was the "possible cause" for the Defect remained

18    unchanged.

19    118.    On July 23, 2014, Honda issued a subsequent Service Bulletin which superseded the

20    March 19, 2014 Service Bulletin. This time, the Service Bulletin was expanded to include 2013-

21    2014 Honda CR-Vs.[68] Honda's statement that the PCM not selecting the correct charge mode was

22    the "possible cause" for the Defect remained unchanged.

23

24

---

25    [66]    https://www.crvownersclub.com/attachments/sb-12-041-2-pdf.7783/ (last accessed July 27,
      2021).

26    [67]    Manufacturer Communication Number: A17-032; https://static.nhtsa.gov/odi/tsbs/2014/MC-

27    10129492-9999.pdf

28    [68]    NHTSA ID No.: 10128561; available at https://static.nhtsa.gov/odi/tsbs/2014/MC-10128561-
      9999.pdf.

119.    On November 8, 2014, Honda issued Service Bulletin 14-071,[69] which warned that "[i] some cases, because of the battery condition and the customer's driving habits, the PCM may not select the correct charge mode, resulting in a battery with a low state-of-charge. If the battery has a low state-of-charge, the engine may not start." This SB related to all 2012 CR-V models.

120.    Also on November 8, 2014, Honda issued a dealership communication warning that 2012 CR-V vehicles contained "issues with the battery management system."[70] Honda described the "problem": "The battery management system may misinterpret state-of-charge (SOC) information if the vehicle is left sitting for an extended period of time, which can cause the system to fail to charge the battery. If the condition persists, the SOC may fall below a level sufficient to start the engine."

**G.    Honda Breached The Express Warranties Covering The Class Vehicles.**

121.    The Class Vehicles sold and leased by Honda included a written express warranty, which provides: "All new Honda vehicles are covered by a 3-Year/36,000-Mile New Vehicle Limited Warranty [.]"[71]

122.    Under the terms of the New Vehicle Limited Warranty, Honda is required to "repair or replace any part that is defective in material or workmanship under normal use."[72]

123.    Each Class Vehicle's original battery is included in the New Vehicle Limited Warranty.[73]

124.    The New Vehicle Limited Warranty period begins once "[t]he vehicle is delivered to the first purchaser by a Honda automobile dealer" or "[t]he vehicle is leased."

---

[69] NHTSA ID No.: 10118181, available at https://static.nhtsa.gov/odi/tsbs/2014/MC-10118181-9999.pdf.

[70] NHTSA ID No.: 10118173, available at https://static.nhtsa.gov/odi/tsbs/2014/MC-10118173-9999.pdf.

[71] https://automobiles.honda.com/cr-v/warranty (last accessed July 27, 2021).

[72] https://owners.honda.com/Documentum/Warranty/Handbooks/2018_Honda_Warranty_Basebook_AWL05251_FINAL.pdf (last accessed July 27, 2021).

[73] *Id.*

125.    Honda also includes a 100-month Replacement Battery Limited Warranty for batteries purchased from a Honda automobile dealer.[74] Under the Replacement Battery Limited Warranty, defective replacement batteries are to be replaced at no cost for the battery, labor, or installation during the first 36 months of service. For the remaining 64 months, the warranty provides for a sliding-scale credit towards the purchase of a replacement battery.

126.    Buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.

127.    Honda breached of these warranties by, *inter alia*, failing to repair or remedy the parasitic draw Defect in the Class Vehicles. Class Members complained to authorized Honda dealerships and technicians about the parasitic draw Defect but did not receive an adequate repair, breaching the express and implied warranties provided by Honda.

128.    Honda's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Honda's warranty limitation is unenforceable because it knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in Honda's warranty periods were also unconscionable and inadequate to protect Plaintiff and other Class members. Among other things, Plaintiff and other Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Honda. A gross disparity in bargaining power existed between Honda and other Class members, and Honda knew of the Defect at the time of sale.

## FRAUDULENT OMISSION/CONCEALMENT ALLEGATIONS

129.    Absent discovery, Plaintiff is unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Honda responsible for making false and misleading statements regarding the Class Vehicles. Honda necessarily is in possession of all of this information. Plaintiff's claims arise out of Defendant's fraudulent omission/concealment of the Defect, despite their representations about the quality, reliability, and safety of the Class Vehicles.

---

[74] *Id.*

130.    Plaintiff alleges that at all relevant times, including specifically at the time he and Class Members purchased their Class Vehicle, Honda knew, or was reckless in not knowing, of the Defect; Defendant had a duty to disclose the Defect based upon its exclusive knowledge; and Defendant never disclosed the Defect to Plaintiff or the public at any time or place in any manner other than inadequate Service Bulletins relating to the Class Vehicles.

131.    Honda actively concealed and omitted the Defect from Plaintiff and Class Members while simultaneously touting the safety and dependability of the Class Vehicles, as alleged herein. Plaintiff is unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Honda responsible for such decisions.

132.    Honda knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Defect, as alleged herein. Defendant concealed and omitted the Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles, as alleged herein.

133.    Honda concealed and omitted material information regarding the Defect at all times while making representations about the safety and dependability of the Class Vehicles on an ongoing basis, and continuing to this day, as alleged herein. Honda still has not disclosed the truth about the full scope of the Defect in the Class Vehicles. Honda has never taken any action to inform consumers about the true nature of the Defect in Class Vehicles. And when consumers brought their vehicles to Honda complaining of the Defect, Honda denied any knowledge of or an adequate repair for the Defect.

134.    Honda concealed and omitted material information regarding the true nature of the Defect in every communication it had with Plaintiff and Class Members and made representations about the quality, reliability, and safety of the Class Vehicles. Plaintiff is not aware of any document, communication, or other place or thing, in which Defendant disclosed the truth about the full scope of the Defect in the Class Vehicles. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Honda's website. There are channels through which Honda could have disclosed the Defect, including but not limited to, (1) point of sale communications; (2) the owner's manual; and/or (3) direct

communication to Class Members through means such as state vehicle registry lists and e-mail notifications.

135. Honda concealed and omitted the Defect from Plaintiff and Class Members and made representations about the quality, safety, dependability, and comfort of the Class Vehicles. Honda actively concealed and omitted the truth about the existence, scope, and nature of the Defect from Plaintiff and Class Members at all times, even though it knew about the Defect and knew that information about the Defect would be important to a reasonable consumer, and Honda promised in its marketing materials that Class Vehicles have qualities that they do not have.

136. Honda actively concealed and omitted material information about the Defect in the Class Vehicles for the purpose of inducing Plaintiff and Class Members to purchase and/or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles, and made representations about the quality, safety, durability, and comfort of the Class Vehicles. Had Honda disclosed the truth, for example in its advertisements or other materials or communications, Plaintiff and Class Members (all reasonable consumers) would have been aware of it, and would not have bought or leased the Class Vehicles or would not have paid as much for them.

## TOLLING OF STATUTES OF LIMITATIONS

137. Any applicable statute(s) of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein. Plaintiff and the members of the Class could not have reasonably discovered the true, latent nature of the Defect until shortly before this class action litigation was commenced. Plaintiff's claim was thus tolled pursuant to the discovery rule and for fraudulent concealment.

### A. Discovery Rule

138. As shown by Plaintiff's experience alleged above, Class Members had no way of knowing about the parasitic draw Defect in their Class Vehicles. Defendant concealed its knowledge of the Defect (as evidenced by the Service Bulletins, detailed above) while continuing to market and sell the Class Vehicles as safe, high-quality, and reliable vehicles.

139. Within any applicable statutes of limitation, Class Members could not have discovered through the exercise of reasonable diligence that Honda was concealing the conduct

complained of herein and misrepresenting the true qualities of the Class Vehicles. As detailed above, Class Members acted reasonably and diligently in attempting to find the source of their electrical and battery-related vehicle issues.

140. Class Members did not know facts that would have caused a reasonable person to suspect that there was a parasitic draw Defect affecting their vehicle's battery and an ordinary person would be unable to appreciate that the vehicle was defective.

141. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to the claims in this litigation.

**B.      Fraudulent Concealment**

142. Defendant was under a continuous duty to disclose to Class Members the existence of the parasitic draw Defect found in the Class Vehicles.

143. Defendant recklessly disregarded the true nature, quality, and character of the Class Vehicles, by failing to disclose the existence of the parasitic draw Defect.

144. The statute of limitations on any counts alleged in this action are tolled during the relevant period alleged herein due to Defendant's concealment of the adverse facts concerning the parasitic draw Defect.

145. Defendant actively concealed from Class Members the truth about the battery failures and related electrical issues as described herein.

146. As shown by Plaintiff's experience alleged above, Class Members were not at fault for failing to discover the relationship between the parasitic draw Defect and their electrical and battery-related vehicle issues. Plaintiff had no actual or presumptive knowledge of facts sufficient to put him on inquiry notice of such a relationship. This ignorance of the true cause of the electrical and battery related vehicle issues is common across Plaintiff and each Class member.

## CLASS ALLEGATIONS

147. Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated.

148. Plaintiff seeks to represent a class ("Nationwide Class") defined as:

All persons in the United States and its territories who are current or

former owners and/or lessees of a Honda CR-V (model years 2017-2019) or Honda Accord (model years 2016-2019).

149.    In addition, and in the alternative to the above, Plaintiff seeks to represent a class ("California Class") defined as:

All persons in the State of California who are current or former owners and/or lessees of a Honda CR-V (model years 2017-2019) or Honda Accord (model years 2016-2019).

150.    Excluded from the Nationwide Class and the California Class (together, "Classes") are Honda, its affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the Classes definition based on discovery and further investigation.

151.    <u>Numerosity</u>: The Classes are so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Classes are unknown at this time, such information being in the sole possession of Defendant, Plaintiff believes, and on that basis alleges, that approximately two million Class Vehicles have been sold and leased in the United States.

152.    <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Classes. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

a.    Whether the Class Vehicles were sold with the Defect;

b.    Whether Defendant engaged in the conduct alleged herein;

c.    Whether Defendant advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

d.    Whether Defendant knew of the parasitic draw Defect but failed to disclose the problem and its consequences to their customers;

e.    Whether a reasonable consumer would consider the parasitic draw Defect or its consequences to be material;

f.    When Defendant discovered the parasitic draw Defect in the Class Vehicles, and what, if anything, it did in response;

g.    Whether Defendant should be required to fully disclose the existence of the parasitic draw Defect;

h.    Whether Defendant breached its express and/or implied warranties with respect to the Class Vehicles;

i.    Whether Defendant's conduct violates the California Legal Remedies Act, California Unfair Competition Law, and the other statutes asserted herein;

j.    Whether Plaintiff and Class Members overpaid for their Class Vehicles; and

k.    Whether Plaintiff and Class Members experienced out-of-pocket losses as a result of the Defect, and if so, how much.

153.    Typicality: Plaintiff's claims are typical of the claims of the Classes because Plaintiff purchased a Class Vehicle with the same Defect as did each member of the Classes. Furthermore, Plaintiff and all Members of the Classes sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendant's wrongful conduct. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent Class Members.

154.    Adequacy: Plaintiff is an adequate representative because his interests do not conflict with the interests of the Classes that he seeks to represent, he has retained counsel competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

155.    Superiority: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and Members of the Classes. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for Members of the Classes individually to redress effectively the wrongs done to them. Even if the Members of the Classes could afford such individual litigation,

the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Classes can be readily identified and notified based on, *inter alia*, Defendant's vehicle identification numbers, warranty claims, registration records, and database of complaints.

156.    <u>Declaratory and Injunctive Relief</u>. Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Nationwide Class and California Class Members as a whole.

157.    Defendant has acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT
#### (Cal. Civ. Code § 1750, *et seq.*)
#### (Brought on behalf of the Nationwide Class)

158.    Plaintiff incorporates by reference each allegation as if fully set forth herein.

159.    Plaintiff brings this claim individually and on behalf of the other members of the Nationwide Class.

160.    Plaintiff alleges, on information and belief that: (1) the decisions of Honda concerning the advertising, marketing and warranty policies and procedures emanate from Honda's headquarters in Torrance, California; (2) Honda's decisions on how to present Class Vehicles in advertising in the United States emanate from its headquarters in Torrance, California; (3) decisions as to recalls, services bulletins, and whether to make warranty repairs all emanate from Honda's headquarters in Torrance, California; and (4) the relevant personnel from Honda work in Honda's headquarters in Torrance, California or coordinate and make decisions concerning the above

1 through facilities and other personnel in Torrance, California. For these reasons, Plaintiff and the

2 Class' claims emanate from Honda's actions in California and it is appropriate for Honda to be held

3 to comply with California law on a nationwide basis.

4    161. Defendant is a person as that term is defined in California Civil Code 5 § 1761(c).

5    162. Plaintiff and the Class Members are "consumers" as that term is defined in

6 California Civil Code §1761(d).

7    163. Honda engaged in unfair and deceptive acts in violation of the California Consumer

8 Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, by the practices described above,

9 and by knowingly and intentionally concealing from Plaintiff and Class Members that the Class

10 Vehicles suffer from a defect(s) (and the costs, risks, and diminished value of the vehicles as a

11 result of this problem). These acts and practices violate, at a minimum, the following sections of

12 the CLRA:

13

14     (a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;

15     (a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

16

17     (a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

18

19     (a)(9) Advertising goods and services with the intent not to sell them as advertised.

20

21    164. Honda's unfair or deceptive acts or practices occurred repeatedly in Honda's trade

22 or business, were capable of deceiving a substantial portion of the purchasing public and imposed

23 a serious safety risk on the public.

24    165. Honda knew that the Class Vehicles were defectively designed or manufactured,

25 would prematurely fail to perform their essential function, and were not suitable for their intended

26 use.

27    166. Honda was under a duty to Plaintiff and the Class Members to disclose the defective

28 nature of the Class Vehicles and the existence of the parasitic draining Defect because:

1    a. Defendant was in a superior position to know the true state of facts about the

2 parasitic draining Defect and associated repair costs in the Class Vehicles;

3    b. Plaintiff and the Class Members could not reasonably have been expected to

4 learn or discover that the Class Vehicles had a parasitic draining Defect until manifestation of the

5 Defect;

6    c. Defendant knew that Plaintiff and the Class Members could not reasonably

7 have been expected to learn or discover the parasitic draining Defect and the associated repair costs

8 that it causes until the manifestation of the Defect; and

9    d. Defendant actively concealed the parasitic draining Defect and the

10 associated repair costs by knowingly failing to recall Class Vehicles.

11  167. In failing to disclose the Defect and the associated safety risks and repair costs that

12 result from it, Defendant has knowingly and intentionally concealed material facts and breached its

13 duty to disclose.

14  168. The facts concealed or not disclosed by Honda to Plaintiff and the Class Members

15 are material in that a reasonable consumer would have considered them to be important in deciding

16 whether to purchase Defendant's Class Vehicles or pay a lesser price. Had Plaintiff and the Class

17 known about the defective nature of the Class Vehicles, they would not have purchased or leased

18 the Class Vehicles or would have paid less for them.

19  169. Plaintiff and Class Members' injuries were proximately caused by Honda's

20 fraudulent and deceptive business practices.

21  170. Plaintiff and the Class members seek equitable relief, and will amend this claim to

22 seek damages after the notice period.

23 **SECOND CAUSE OF ACTION**<br>**VIOLATION OF THE CALIFORNIA UNFAIR BUSINESS PRACTICES ACT**

24 **(Cal. Bus. & Prof. Code § 17200, *et seq.*)**<br>**(Brought on behalf of the Nationwide Class)**

25

26  171. Plaintiff incorporates by reference each allegation as if fully set forth herein.

27  172. Plaintiff brings this claim individually and on behalf of the other members of the

28 Nationwide Class.

173.    The UCL defines unfair competition to include any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with § 17500) of Part 3 of Division 7 of the Business and Professions Code." See California Business and Professions Code § 17200.

174.    Defendant violated the UCL by engaging in unlawful, unfair, and deceptive business acts and practices.

175.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

176.    Pursuant to Cal. Bus. & Prof. Code §17204, each of the Plaintiff named herein, and the members of the proposed Class, have suffered injury in fact and have lost money or property because of the unfair competition set forth herein.

177.    Plaintiff alleges, on information and belief, that: (1) the decisions of Honda concerning the advertising, marketing and warranty policies and procedures emanate from Honda's Torrance, California headquarters; (2) Honda's advertising decisions on how to present and/or market Class Vehicles in the United States emanate from its headquarters in Torrance, California; (3) decisions as to recalls, services bulletins, and whether to make warranty repairs all emanate from Honda's headquarters in Torrance, California; and (4) the relevant personnel from Honda operate from Honda's headquarters in Torrance, California or coordinate and make decisions concerning the above through facilities and other personnel in Torrance, California. For these reasons, Plaintiff and the Class' claims emanate from Honda's actions in California and it is appropriate for Honda to be held to comply with California law on a nationwide basis.

178.    Honda's conduct, as described herein, was and is in violation of the UCL. Honda's conduct violates the UCL by, among other things:  (i) failing to disclose the existence of the parasitic draining defect in the Class Vehicles; (ii) marketing and promoting the Class Vehicles as being free from defect, including the parasitic draining defect which causes the Class Vehicles to fail to perform their essential function and creates safety risks; (iii) knowingly and intentionally concealing the existence of the Defect in the Class Vehicles; (iv) violating California laws, including the CLRA; and (v) breaching its express and implied warranties.

179.    Honda intentionally and knowingly misrepresented and omitted material facts regarding the Class Vehicles with intent to mislead Plaintiff and the other Class members.

180.    In purchasing or leasing the Class Vehicles, Plaintiff and the other Class members were deceived by Honda's failure to disclose the parasitic draw Defect found in the Class Vehicles.

181.    Plaintiff and the other Class members reasonably relied upon Honda's false misrepresentations and omissions. They had no way of knowing that Defendant's representations were false, misleading, and incomplete. As alleged herein, Defendant engaged in a pattern of deception and public silence in the face of a known parasitic draining defect in the Class Vehicles. Plaintiff and the other Class members did not, and could not, discover Defendant's deception on their own.

182.    Defendant knew or should have known that its conduct violated the UCL.

183.    Defendant owed Plaintiff and the other Class members a duty to disclose the truth about the parasitic draw Defect because the Defect created a safety hazard and Defendant: (i) possessed exclusive knowledge of the Defect; (ii) intentionally concealed the Defect from Plaintiff and the Class; and/or made incomplete representations by failing to warn the public or to recall the Class Vehicles due to the Defect.

184.    Defendant had a duty to disclose that the existence of the Defect in the Class Vehicles, because Plaintiff and the other Class members relied on Defendant's material misrepresentations and omissions.

185.    Defendant's conduct proximately caused injuries to Plaintiff and the other Class members that purchased or leased the Class Vehicles and suffered harm as alleged herein.

186.    Plaintiff and the other Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendant's conduct in that Plaintiff and the other Class members incurred costs related the parasitic drain caused by the Defect, including replacement of electrical components and service costs, and overpaid for their Class Vehicles that have suffered a diminution in value.

187.    Plaintiff and the Class members are suffering from continuing injuries because Honda has failed to issue an adequate remedy for the Defect found in each Class Vehicle. Defendant's unlawful acts and practices complained of herein affect the public interest.

188.    Defendant's misrepresentations and omissions alleged herein caused Plaintiff and the other Class members to make their purchases or leases of their Class Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Class members would not have purchased or leased these vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not suffer from the parasitic draw Defect and failed to live up to industry standards.

189.    Accordingly, Plaintiff and the other Class members have suffered injury-in-fact, including lost money or property, as a result of Defendant's misrepresentations and omissions.

190.    Plaintiff requests that this Court enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendant, and order restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200, including reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

**THIRD CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
**(Cal. Comm. Code §§ 2313, 10210)**
**(Brought on behalf of the Nationwide Class)**

191.    Plaintiff incorporates by reference each allegation as if fully set forth herein.

192.    Plaintiff brings this claim individually and on behalf of the other members of the Nationwide Class.

193.    Defendant  is a merchant, seller, and lessor of motor vehicles within the meaning of Cal. Com. Code § 2104.

194.    Plaintiff and the Class' claims emanate from Honda's actions in California, and thus, the application of California extraterritorially to the claims of the Class in this action is proper.  As alleged herein, Honda's advertising, marketing and warranty policies and procedures emanate from Honda's headquarters in Torrance, California.   In addition, upon information and belief,

Defendant's advertising decisions emanated from its headquarters in Torrance, California, as well as its decisions as to recalls, services bulletins, and whether to make warranty repairs. Further, Defendant's relevant personnel are located at facilities in Torrance, California.

195.    Pursuant Cal. Com. Code § 2313 (a)(1), "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

196.    Pursuant Cal. Com. Code § 10210(a)(1), "[a]ny affirmation of fact or promise made by the lessor to the lessee which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods will conform to the affirmation or promise."

197.    The Class Vehicles are goods within the meaning of the Uniform Commercial Code and relevant state law.

198.    Defendant provided all purchasers and lessees of the Class Vehicles with the express warranties described herein. In its written express warranties, Defendant expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

199.    Defendant's written express warranties formed the basis of the bargain that was reached when Plaintiff and the other Class Members purchased or leased their Class Vehicles.

200.    Defendant breached the express warranties through the acts and omissions described above.

201.    Plaintiff and the other Class Members have had sufficient direct dealings with either Defendant or its agents (*e.g.*, dealerships, consumer affairs departments, and technical support) to establish privity of contract between Defendant on one hand, and Plaintiff and each of the other Class Members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class Members are intended third-party beneficiaries of contracts between Defendant and their dealers, and specifically, of Defendant's express warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Additionally, privity is excused here because Plaintiff

and each of the other Class Members relied on statements made by Defendant itself in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform, and was controlled and disseminated directly by Defendant.

202. Defendant knew that it was unable to provide adequate remedy under the warranty. Defendant was also provided notice of the parasitic draw Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge. Honda has not remedied its breach.

203. Further, Defendant has refused to provide an adequate warranty repair for the parasitic draw Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair, as Plaintiff has, due to the parasitic draw Defect have been denied adequate repairs.

204. The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class Members whole and because Defendant has failed and/or has refused to adequately provide effective remedies within a reasonable time.

205. Accordingly, recovery by Plaintiff and the other Class Members is not limited to the limited remedy of repair, and Plaintiff, individually and on behalf of the other Class Members, seeks all remedies as allowed by law.

206. Also, as alleged in more detail herein, at the time that Honda warranted and sold or leased the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Defendant  improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class Members were therefore induced to purchase or lease the Class Vehicles under false pretenses.

207. Defendant had notice of its breach as alleged herein.

208. As a direct and proximate result of  Defendant's breach of its express warranty, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Cal. Comm. Code §§ 2314, 10212)**
**(Brought on behalf of the Nationwide Class)**

209.   Plaintiff incorporates by reference each allegation as if fully set forth herein.

210.   Plaintiff brings this claim individually and on behalf of the other members of the Nationwide Class.

211.   Defendant is a merchant, seller, and lessor of motor vehicles within the meaning of Cal. Com. Code § 2104.

212.   Plaintiff and the Class' claims emanate from Honda's actions in California, and thus, the application of California extraterritorially to the claims of the Class in this action is proper.  As alleged herein, Honda's advertising, marketing and warranty policies and procedures emanate from Honda's headquarters in Torrance, California.   In addition, upon information and belief, Defendant's advertising decisions emanated from its headquarters in Torrance, California, as well as its decisions as to recalls, services bulletins, and whether to make warranty repairs.  Further, Defendant's relevant personnel are located at facilities in Torrance, California.

213.   Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased.

214.   Pursuant to Cal. Com. Code § 2314(1) "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Goods are merchantable if they are "fit for the ordinary purposes for which such goods are used" and "conform to the promises or affirmations of fact made on the container or label if any." § Cal. Com. Code § 2314(2)(c),(f).

215.   Defendant provided Plaintiff and the other Class members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles suffered from the parasitic draw Defect at the time of sale that causes various safety features to fail without warning, creates the undue risk of the engine stalling while driving, and results in the premature depletion of batteries and alternators. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

216. Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by Defendant were safe and reliable for providing transportation and would not result in the premature failure of its batteries.

217. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and the other Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from a defective design(s) and/or manufacturing defect(s).

218. Defendant knew or had reason to know of these material facts, and wrongfully and fraudulently concealed these material facts from Plaintiff and the Class. Defendant was provided notice of these issues by complaints lodged by consumers with NHTSA—which Defendant routinely monitors—before or within a reasonable amount of time after the allegations of the Defect became public.

219. Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

220. Plaintiff and the other Class Members have had sufficient direct dealings with either Defendant or its agents – such as its dealerships, consumer affairs departments, and technical support -- to establish privity of contract between Defendant on one hand, and Plaintiff and each of the other Class Members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class Members are intended third-party beneficiaries of contracts between Defendant and their dealers, and specifically, of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Additionally, privity is excused here because Plaintiff and each of the other Class Members relied on statements made by Defendant itself in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform, and was controlled and disseminated directly by Defendant.

221.   Plaintiff, on behalf of himself and the Class, seeks monetary damages, treble damages, costs, attorneys' fees, and such other and further relief provided by law and equity.

**FIFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(Brought on behalf of the Nationwide Class, or Alternatively, the California Class)**

222.   Plaintiff incorporates by reference each allegation as if fully set forth herein.

223.   Plaintiff brings this claim individually and on behalf of the other members of the Nationwide Class, or alternatively, the California Class (the "Class" for purposes of this Count).

224.   Defendant designed, manufactured, produced, distributed, marketed, and/or sold the Class Vehicles during the relevant period herein.

225.   Plaintiff and members of the Class conferred non-gratuitous benefits upon Defendant, without knowledge that the Class Vehicles contained the Defect.

226.   Defendant appreciated, or had knowledge of, the non-gratuitous benefits conferred upon them by Plaintiff and members of the Class.

227.   Defendant accepted or retained the non-gratuitous benefits conferred by Plaintiff and members of the Class, with full knowledge and awareness that, as a result of Defendant's unconscionable wrongdoing, Plaintiff and members of the Class were not receiving product of high quality, nature, fitness or value that had been represented by Defendant and reasonable consumers would have expected.

228.   Retaining the non-gratuitous benefits conferred upon Defendant by Plaintiff and members of the Class under these circumstances made Defendant's retention of the non-gratuitous benefits unjust and inequitable.

229.   Because Defendant's retention of the non-gratuitous benefits conferred by Plaintiff and members of the Class is unjust and inequitable, Plaintiff and members of the Class are entitled to, and hereby seek disgorgement and restitution of Defendant's wrongful profits, revenue, and benefits in a manner established by the Court.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, respectfully prays that the Court:

A.    Issue an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure; declaring that Plaintiff is a proper class representative; and appointing Plaintiff's counsel as Class Counsel;

B.    Award Plaintiff and Class Members damages , restitution and disgorgement in an amount to be determined at trial;

C.    Order appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff and Class Members with appropriate curative notice regarding the existence and cause of the Defect;

D.    Award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses, including pursuant to California Code of Civil Procedure § 1021.5;

E.    Award pre- and post-judgment interest at the maximum legal rate; and

F.    Grant all such other relief as is just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all claims so triable.

Dated: July 28, 2021                    **KAPLAN FOX & KILSHEIMER LLP**

By: */s/ Laurence D. King*
Laurence D. King

Laurence D. King (SBN 206423)
Kathleen A. Herkenhoff (SBN 168562)
1999 Harrison Street, Suite 1560
Oakland, CA  94612
Telephone: (415) 772-4700
Facsimile:  (415) 772-4707
Email: *lking@kaplanfox.com*
        *kherkenhoff@kaplanfox.com*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KUZYK LAW, LLP**
Michael D. Braun (SBN 167416)
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA  90067
Telephone:  (213) 401-4100
Facsimile:  (213) 401-0311
Email: *mdb@kuzykclassactions.com*

*Counsel for Plaintiff and the Proposed Class*